# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE:<br><br>FARMERS GRAIN, LLC,<br><br>  Debtor. | Case No. 17-00450-TLM<br>Chapter 7 |
| NOAH G. HILLEN, Trustee,<br><br>  Plaintiff,<br><br>v.<br><br>CLARICH FARMS, LLC,<br><br>  Defendant. | Adv. No. 19-06009-TLM |
| v.<br><br>DESERET FARMS, INC.,<br><br>  Defendant. | Adv. No. 19-06010-TLM |
| v.<br><br>FRAHM FARM, LLC,<br><br>  Defendant. | Adv. No. 19-06011-TLM |

MEMORANDUM OF DECISION - 1

| | |
|---|---|
| v.<br><br>**GW FARMS, LLC,**<br><br>    **Defendant.** | **Adv. No. 19-06013-TLM** |
| v.<br><br>**PETERSON FARMS OF NYSSA, INC.,**<br><br>    **Defendant.** | **Adv. No. 19-06015-TLM** |

## MEMORANDUM OF DECISION

**INTRODUCTION**

Farmers Grain, LLC ("Debtor" or "Farmers Grain") filed a petition for relief under chapter 11 on April 18, 2017.[1]  The case was converted to a liquidation under Chapter 7 on August 15, 2017.  A chapter 7 trustee, Noah Hillen ("Trustee"), was appointed.

In the process of administering the case, Trustee determined that causes of action to recover alleged preferential transfers should be pursued.  At issue here are Trustee's complaints commencing adversary proceedings against Clarich Farms, LLC; Deseret Farms, Inc.; Frahm Farm, LLC; GW Farms, LLC; and Peterson Farms of Nyssa, Inc., (collectively the "Defendants") as reflected in the above conjoined caption.  In each such

---

[1] Unless otherwise indicated, statutory citations are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532 and citations to "Rule" are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 2

action, Trustee alleges Defendants' receipt of certain funds from Debtor constitute preferential transfers under § 547(b).  The five Defendants—who are represented by the same law firm—each dispute Trustee's basic allegations and contend there was no preference under § 547(b)(1)–(5) and, if there was a preference, defenses exist under § 547(c).

On January 7, 2020, each Defendant filed a motion for summary judgment under Rule 7056 (incorporating Fed. R. Civ. P. 56) and LBR 7056.1.  On January 15, 2020, Trustee filed his own motion seeking summary judgment in each case.  Defendants' motions and Trustee's motions came on for a consolidated hearing on February 12, 2020, and were taken under advisement following argument of counsel.

This Decision constitutes the Court's resolution of the competing motions.  This Decision, and a related Order, will be entered in the docket of each of these adversary proceedings.

**JURISDICTION**

Based on the allegations and statements made pursuant to Rule 7008 in the complaints and Rule 7012(b) in the amended answers, and further by the express agreement of counsel for Trustee and Defendants at a joint pretrial conference on May 29, 2019, these adversary proceedings are core proceedings over which the Court

MEMORANDUM OF DECISION - 3

exercises jurisdiction, 28 U.S.C. §§ 157, 1334, and in which it enters final orders and judgments subject to appeal, § 28 U.S.C. 158.[2]

**SUMMARY JUDGMENT AUTHORITIES**

Summary judgment may be granted if, when the evidence is viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Farmers Grain, LLC v. DC Land Operating Company, LLC (In re Farmers Grain, LLC)*, 2018 WL 770360, *2 (Bankr. D. Idaho Feb. 7, 2018) (citing *Thorian v. Baro Enters., LLC (In re Thorian)*, 387 B.R. 50, 61 (Bankr. D. Idaho 2008) (internal citations omitted)). The Court cannot weigh evidence in resolving such motions but, rather, is to determine only whether a material factual dispute remains for trial. *Id.* A dispute is genuine if there is sufficient evidence for a reasonable fact finder to hold in favor of the non-moving party. *Id.* A fact is material if it might affect the outcome of the case. *Id.* The initial burden of showing no genuine issue of material fact rests on the moving party. If that burden can be met, the burden will shift to the nonmoving party to produce evidence that a genuine issue of material fact does exist. *Id.* (internal citations omitted).

In addition, summary judgment is inappropriate where, in evaluating declarations and affidavits submitted by the parties, the Court must consider credibility or the weight to be given testimony. *Reynard v. Green Valley Lake Holdings, LLC (In re Resler)*, 2019

---

[2] Farmers Grain was located in Nyssa, Malheur County, Oregon. This Court presides over bankruptcy cases arising in Malheur County. *In re Hess*, 2014 WL 2565906, *1, n.6 (Bankr. D. Idaho June 6, 2014); *In re Schiemer*, 2009 WL 741887, *1, n.2 (Bankr. D. Idaho Mar. 19, 2009) (citing *In re Vansickle*, 350 B.R. 897, 898 n.1 (Bankr. D. Idaho 2006)).

MEMORANDUM OF DECISION - 4

WL 1510335, *3–4 (Bankr. D. Idaho Mar. 4, 2019) ("It is important, and ordinarily essential, that the trier of fact be afforded the opportunity to observe the demeanor, during direct and cross-examination, of a witness whose subjective motive is at issue."). The opportunity of counsel to explore testimony through examination and cross-examination, as well as for the Court to listen to and weigh such testimony in all relevant regards, are critical aspects of adjudication.

> As the Ninth Circuit once explained:
>
> Neither party's evidence established—beyond the declarants' conflicting assertions—whether Albrecht attended training before the fire. The district court chose to credit the Sure Marine declaration, however, dismissing Albrecht's contrary declaration as unsubstantiated. In accepting one account over the other, the court improperly resolved an evidentiary conflict at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary judgment stage).

*Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 861 (9th Cir. 2011). As also stated in *Anderson*: "[I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (citations omitted). Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted).

## DISCUSSION AND DISPOSITION

### A. The parties' submissions and positions, generally

As noted above, each Defendant filed its motion on January 7, 2020. In support of the motion, each Defendant also filed on the same date a brief, several declarations, and a

MEMORANDUM OF DECISION - 5

Statement of Disputed/Undisputed Facts ("Statement").[3]  For example, in *Hillen v. Clarich Farms*, Defendant filed its motion, a brief in support of the motion, the Statement, and three declarations (those of Karl Clarich, Defendant's counsel, and Chester Millsap, an employee of Farmers Grain).  Adv. No. 19-06009-TLM at Doc. Nos. 22–27.  Then, on January 15, Trustee filed his own motion, a brief in support of the motion, a Statement, a declaration of Trustee, and another declaration of Millsap as a Farmers Grain employee.  *Id.* at Doc. Nos. 29–33.  Thereafter, on January 29, Trustee filed a brief opposing Defendant's motion, and a "Response" to Defendant's Statement challenging its assertion of "undisputed" facts.  *Id.* at 35–36.  Later that same day, Defendant filed a brief opposing Trustee's motion and a document similarly disputing Trustee's Statement.  *Id.* at 37–38.  Finally, on February 5, both parties filed reply briefing.  *Id.* at 39–40.

Similar filings were made in the other four adversary proceedings.  The Court has reviewed them all.  The Court has also evaluated the dockets in the other four cases, and found that the timing and nature of the submissions are almost identical, including virtually verbatim assertions in the declarations.  While there are some differences because there are separate Defendant entities, wheat was delivered on separate dates,

---

[3] LBR 7056.1(b)(1)(A) provides:

"(A) The moving party shall provide simultaneously with its [summary judgment] motion, in a document separate from all others, a statement of asserted undisputed facts.  The statement shall not be a narrative but shall set forth each fact in a separate numbered paragraph.  For each fact, the moving party shall provide a specific citation (including page, paragraph, and/or line number as appropriate) to an affidavit, deposition, or other portion of the record establishing such fact.  Failure to submit such a statement in compliance with this rule constitutes grounds for denial of the motion without a hearing."

MEMORANDUM OF DECISION - 6

wheat was paid for on separate dates, and the "Defendant's declaration" came from different individuals who describe their own relationship with Farmers Grain, there was much repetition and such differences do not impact the Court's analysis of the motions for purposes of this Decision.

### 1. Trustee's position

Trustee's complaints in these cases concern soft white wheat ("SWW") grown by Defendants. The parties agree that SWW is harvested in July of each year. At issue here is the SWW harvested by Defendants in the summer of 2016 and delivered at that time to Farmers Grain. Trustee seeks to avoid certain payments thereafter made to Defendants in 2017 prior to the April 18, 2017 petition date. To wit:

| Defendant | Date of check(s) | Amount |
| --- | --- | --- |
| Clarich Farms | 1/14/17[4] | $65,229.94 |
| Deseret Farms | 4/17/17 | $206,448.74 |
| Frahm Farm | 4/5/17 | $65,777.48 |
| GW Farms | 3/3/17 | $83,746.18 |
| GW Farms | 3/4/17 | $179,758.66 |
| Peterson Farms | 2/17/17 | $167,584.32 |
| Peterson Farms | 2/17/17 | $5,526.30 |

Trustee contends Farmers Grain operated a grain elevator business through which it bought, and thereafter sold, grain including SWW. Trustee contends Defendants' delivery of the grain at issue in these cases in the summer of 2016 was not a warehousing

---

[4] This is more than 90 days prior to the petition date, but Trustee's amended complaint alleges this check was "paid within 90 days of the date of the Petition." Case No. 19-6009-TLM at Doc. No. 6 at 2, ¶ 5. *See MBNA America v. Locke (In re Green)*, 223 F.3d 1064, 1067 n.3 (9th Cir. 2000) (citing *Barnhill v. Johnson*, 503 U.S. 393, 398–99 (1992)) ("For purposes of § 547(b), a transfer occurs when the check is honored by the debtor's bank.").

(Continued)

MEMORANDUM OF DECISION - 7

or bailment (contending, among other things, that Farmers Grain failed to comply with Oregon statutory requirements for the same).[5]  Rather, Trustee argues there was a sale of the grain to Farmers Grain at the time of delivery by Defendants and similarly situated farms.  Trustee argues Defendants were creditors as a result of such sales, and the specific payments for the grain here at issue occurred within 90 days of Farmers Grain's chapter 11 filing constituting preferential transfers.

### 2. **Defendants' position**

The primary contention of each Defendant is that it was not a "creditor" of Debtor because the SWW was not "sold" to Debtor and, thus, it did not receive a transfer, as a creditor, on account of an antecedent debt, as required under § 547(b)(1) and (2). Instead, Defendants posit that Farmers Grain was a "grain storage facility" and would, under a "statutory bailment relationship," store the grain delivered by each Defendant until such time as that Defendant (which regularly monitored the market price for the commodity) directed that it be sold.  Defendant then would receive the value of the grain, priced as of such date, less a calculated "storage fee."  Defendants also assert several defenses in the event the Court were to determine they were creditors and the § 547(b) requirements were met.  They argue (a) they had a statutory lien under applicable state law and thus were not unsecured creditors, (b) the storage and sale was consistent with the parties' ordinary course of business; and/or (c) the sale of the grain and payment to Defendants constituted a contemporaneous exchange.  *See*, *e.g.*, § 547(c)(1)–(3).

---

[5] Since Farmers Grain was located in Oregon, Oregon statutory law applies. *See Vansickle*, 350 B.R. at 898 n.1.

### 3. The Millsap declarations

As noted, Defendants submitted a declaration of Chester Millsap. *See*, *e.g.*, Case No. 19-06009-TLM at Doc. No. 27. In it, Millsap states he was an employee of Farmers Grain and his job included "handling contracts for commodities delivered to Farmers Grain for sale, and handling scale tickets and other documents for commodities delivered to Farmers Grain." *Id.* at 2. He also states that "Farmers Grain both purchased and stored commodities." *Id.* at 2. He explains:

> If commodities were delivered by a farmer like the Defendant to Farmers Grain, it was the practice, on the date of delivery, to have Farmers Grain issue a scale ticket to the farmer. . . . Farmers Grain retained a copy of the scale ticket to document the delivered commodity. If the commodity was not previously contracted or priced upon delivery, then usually the commodity would be kept at Farmers Grain until the farmer directed their sale. If not priced within approximately 60 days of delivery a "storage" (a common grain elevator term) fee was assessed upon the unpriced commodity until such time as the farmer ordered the sale.

*Id.* Millsap says that he, with the input of Galen Jantz (the principal of Farmers Grain), would track the market price for unpriced commodities "nearly every day" and he would receive calls from farmers from time to time "to determine the price of their unpriced commodity on a given day." *Id.* Then:

> When Farmers Grain received a sale order from a farmer, normally in an email, I would advise Galen Jantz. Based upon that sale order from the farmer, Farmers Grain would sell the commodity as directed, and would issue a final settlement statement (reflecting a summary of the scale tickets for the commodity, the sales price, and deductions for storage). Typically, within a few days, Farmers Grain issued the farmer a check, equal to the net amount reflected on the final settlement statement. . . . During all of these transactions over a period of years, the same storage procedure would be followed in each case, as outlined above. It varied little, and it always involved the scale tickets, the check, the final settlement statement, all as indicated above.

MEMORANDUM OF DECISION - 9

*Id.* at 2–3.

Millsap, however, also executed a declaration that was filed by Trustee. *See*, *e.g.*, Case No. 19-06009-TLM at Doc. No. 33. It added to the statements made in the declaration he provided Defendants. *Id.* at 2. He explained the harvest of SWW in July of each year "generated large amounts of truck deliveries to Farmers Grain's bins or elevators[.]" *Id.* He also declared that "[t]he deliveries of one growers [*sic*] SWW in July were co-mingled with all other SWW deliveries from other growers. Farmers Grain never segregated, tracked, or labelled any delivered SWW received from or for any specific grower, except for one or two instances of weevil infestations." *Id.* He further explained:

> During and after the SWW harvest and deliveries received in July, Farmers Grain shipped large amounts of SWW to buyers in the Tri-Cities WA area. These shipments increased cash flow and was necessary to free up bin or elevator space in preparation for the corn harvest in October of each year. The corn harvest also generated large amounts of truck deliveries of corn to Farmers Grain's bins and elevators. Prior [to] shipping of these large amounts of SWW to buyers in the Tri-Cities area, Farmers Grain did not get the permission or consent from any of the farmers who originally delivered the SWW to Farmers Grain in July.

*Id.* at 2–3.[6] Millsap further states:

> It was my understanding, that each delivery to Farmers Grain of SWW or Corn had to be paid for to the farmer at some time after the deliveries were made. Farmers Grain did not issue warehouse receipts to farmers in exchange for deliveries of SWW or other grain. No farmer ever came back and picked up previously delivered grain.

---

[6] Shipping to "buyers" in the Tri-Cities area—not only because Farmers Grain needed elevator space but also to "increase[] cash flow"—seemingly connotes a sale of the commodity by Farmers Grain. That in turn raises questions about Farmers Grain's alleged "storage" of a given farm's SWW until such farm directed a sale at a given market price occur, which might even be the following year.

MEMORANDUM OF DECISION - 10

> Some farmers delivering SWW in July of the year chose to be paid shortly after delivery. Some farmers signed a Wheat Contract in advance of harvest documenting an "oral agreement to buy and sell" selecting a future date and set price to be paid usually in September following the July harvest. Some farmers delivering SWW in July of the year, chose to not agree to any date for payment or price, but were allowed to defer receipt of payment to a future date of their choosing, upon which date a fluctuating market price would be quoted and paid. Very few farmers waited until the spring of the following year to be paid for their SWW delivered in July of the previous year.

*Id.* at 3. In addition, Millsap again addressed the question of warehousing grain:

> In my capacity and duties for Farmers Grain in handling deliveries, purchases, sales, and payments for grain, I was not aware of any licensing, bonding, or insuring of Farmers Grain with any governmental agency regarding the storage of grain. I was not aware of any licensing of Farmers Grain through the Oregon Department of Agriculture as a "public warehouse" or "warehouseman" regarding storage of grain. To my knowledge Farmers Grain was not licensed under Oregon law as a "public warehouse" or "warehouseman" for grain storage.

*Id.* at 3–4.

### 4. The Statements

Consistent with LBR 7056.1, the parties provided the Statements setting forth alleged undisputed facts in support of their respective motions. They also filed responses to the other's Statements, contending that certain allegedly undisputed facts were in fact disputed.[7] For example, Trustee responded to the repeated assertion by Defendants that Farmers Grain "operated as a grain storage facility" with the repeated assertion that "Debtor was not licensed or authorized to 'store' grain for farmers and did not in fact

---

[7] *See, e.g.*, *Hillen v. Clarich Farms, LLC*, Adv. Proc. No. 19-06009-TLM at Doc. No. 24 (Defendant's Statement in support of its motion); Doc. No. 31 (Trustee's Statement in support of its motion); Doc. No. 36 (Trustee's response to Defendant's Statements); Doc. No. 38 (Defendant's response to Trustee's Statement).

MEMORANDUM OF DECISION - 11

store the grain but immediately began reselling the SWW to buyers in Tri-Cities, WA. Debtor only bought and sold grain." *Id.* at Doc. No. 36 at 2-4. In kind, Defendants responded to Trustee's Statement (which asserted that Farmers Grain from February 2011 to August 2017 "operated a grain elevator business buying and selling wheat and corn") by contending "it is undisputed that Framers Grain operated a grain storage facility at all times relevant to this adversary proceeding." *Id.* at Doc. No. 38 at 2.

In short, the Statements, and the responses thereto, track the wholly contrary positions taken by the litigants. Having reviewed the Statements at length, the Court is confident that only a small subset of factual assertions in the Statements could be legitimately claimed to be "undisputed" by both parties.

### 5. Other submissions

There are certain documents submitted that reflect actual sales of commodities by farms, including some Defendants, to Farmers Grain. *See*, *e.g.*, Adv. Proc. No. 19-6009-TLM, Doc. No. 32 (Trustee's Declaration) at 70 and 72 (2015 crop buy-sell "wheat contracts" by GW Farms); 80, 96 and 112 (same, by Deseret Farms); at 89 (same, by Frahm Farm); and 95 (same, by Peterson Farms). However, none of Trustee's Declarations provide similar "wheat contracts" in connection with SWW deliveries *in 2016* by Defendants. And, there are documents submitted by Defendants that purport to be storage settlements. *See*, *e.g.*, Adv. Proc. No. 19-06010-TLM, Doc. No. 26 (Declaration of James Farmer of Deseret Farms at 4–7 and 13 (addressing 2016 storage and settlement).

MEMORANDUM OF DECISION - 12

### B. Resolution

Under the authorities earlier outlined, the Court should not be expected to mine submissions to determine on its own the absence of genuine issue of material fact. The burden, as noted, rests on the movant to establish there is no genuine issue of disputed fact. Here, while Defendants and Trustee filed Statements alleging undisputed facts supporting their motions, the responses to those Statements manifest significant material dispute. Moreover, the Millsap Declarations create their own factual questions, which are not resolved by the other declarations, nor assuaged by counsels' competing arguments.

As this Court stated when denying competing motions for summary judgment in *Gugino v. Clark's Crystal Springs Ranch, LLC (In re Clark)*, 2014 WL 2895428, *2 (Bankr. D. Idaho June 25, 2014):

> [T]he Court determines that to grant summary judgment to either party would require the Court to make impermissible credibility determinations, to make inappropriate inferences favoring the respective movant, or to disregard information provided by the opponent that creates disputed facts.

So, too, here. The Court's decision in *Reynard* is also apropos:

> There is much in this case that could be debated, as evidenced by the briefing and arguments of the parties. However, the fundamental question presented under the Motion is whether there is an absence of any genuine issue of material fact, and that the undisputed facts require judgment as a matter of law. Precious few factually complicated cases meet this mark. The instant case is not one of them. Since testimonial credibility and weight are manifestly at issue, summary judgment is not appropriate.

*Reynard*, 2019 WL 1510335 at *5.

MEMORANDUM OF DECISION - 13

**CONCLUSION**

For the foregoing reasons, the Court finds and concludes both motions will be denied. While it has outlined several of the disputes, of fact and law, that appear to be implicated by the motions and their supporting and opposing submissions, the Court has reached no conclusions and has not reached or made any factual findings. None should be assumed from the very summary outline above. In *Zazzali v. Goldsmith (In re DBSI Inc.)*, 2013 WL 1498365, *5 (Bankr. D. Idaho Apr. 11, 2013), this Court explained:

> Much as the case where a motion for summary judgment is denied, a court that will later conduct a bench trial in that same cause is well advised to keep discussion of facts in its ruling to a minimum, thus avoiding commentary or characterization that might lead the parties to assume (erroneously, of course) that decisions have been reached on the facts prior to the presentation of evidence.

The Court has attempted to keep its necessary discussion of the context of this dispute free from any such suggestion.

An order will be entered on this Decision in each of these five adversary proceedings denying both Trustee's and Defendants' summary judgment motions.

DATED: March 9, 2020

_____
TERRY L. MYERS
U.S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 14